The **GREAT ATLANTIC & PACIFIC TEA COMPANY, INC.**

v.

Robert **CARMAN, et al.**

Civ. A. No. 86–4462.

United States District Court, E.D. Pennsylvania.

Jan. 10, 1992.

---

**11.** The "ownership" of the Irvine, California post office box shall be included within the scope of this discovery.

Leonard Scheinholtz, Hollis T. Hurd, Pittsburgh, Pa., J. Thomas Morris, Christopher K. Walters, Philadelphia, Pa., for plaintiff.

Rory Judd Albert, New York City, Frank C. Sabatino, Daniel J. Carrigan, Bernard N. Katz, Philadelphia, Pa., Howard Simonoff, Haddonfield, N.J., for defendants.

## MEMORANDUM

O'NEILL, District Judge.

### I. *Introduction*

This action was brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as amended by the Multiemployer

Pension Plan Amendments Act of 1980 ("MPPAA," "the Act" or "the statute"). Both parties have moved to vacate in part and to enforce in part the arbitration award.

In its complaint, filed July 28, 1986, the Great Atlantic and Pacific Tea Company ("A & P" or "employer") sought a declaratory judgment of this Court that two amendments adopted by the United Food and Commercial Workers Union and Participating Food Industry Employers Tri–State Pension Fund ("Fund" or "Plan") violated the statute and were therefore void. Plaintiff A & P sought to enjoin the Fund from applying the amendments. In part, plaintiff claimed that the Fund's amended procedure for the abatement of withdrawal liability imposed on employers whose contributions had dropped below a certain percentage failed to comply with the Act. More specifically, A & P claimed that the Fund's "35% rule" did not meet a requirement of Section 4205(c)(2), codified at 29 U.S.C. § 1385(c)(2), regarding the equitable reduction of withdrawal liability.

The full procedural history is summarized in the Arbitrator's decision. It is sufficient here to note that the Fund counterclaimed, alleging that A & P attempted to evade or avoid withdrawal liability. By Order entered December 5, 1988, I stayed the proceedings and referred the complaint and counterclaim to arbitration. Pursuant to that Order and to the Stipulation and Consent Order entered August 13, 1986, the Fund demanded and A & P has paid withdrawal liability payments, which have been decreased pursuant to the Fund's abatement rules which are the subject of this dispute.

Before me are plaintiff's and defendant's motions to vacate in part and to enforce in part the decision of Ira F. Jaffe, Esq., the Impartial Arbitrator, and plaintiff's request for an immediate refund.[1] Plaintiff moves to enforce and defendant to vacate that portion of the Arbitrator's decision striking down the Fund's amendment of the withdrawal liability procedure, the so-called 35% Rule. At oral argument, the parties agreed that if I found in favor of A & P on the 35% Rule, meaning that if I affirmed the Arbitrator's legal conclusion that the Fund's Rule violates the statute, all other issues raised by the parties would be moot, with the exception of the demand by A & P for immediate payment.[2] Hearing Tr. at 43, 45–46; see Plaintiff's Supplemental Motion to Vacate Arbitration Award in Part at ¶ 3; Plaintiff's Brief in Opposition to Defendant's Motion to Vacate Arbitration Award on the Invalidity of the 35% Rule Amendment and in Support of its Motion to Enforce at 12. As I find the Arbitrator ruled correctly on the Fund's 35% amendment, I need reach in addition only the issue of whether the Fund must make a refund to A & P. I will address each issue in turn.

## II. Standard of Review

In reviewing an MPPAA arbitration, the Arbitrator's factual findings are presumed to be correct and are "rebuttable only by a clear preponderance of the evidence." *Huber v. Casablanca Industries, Inc.,* 916 F.2d 85, 89 (3d Cir.1990) (quoting 29 U.S.C. § 1401(c)). The Arbitrator's legal conclusions are to be reviewed *de novo. Huber,* 916 F.2d at 89. The parties agree on the standards of review and do not dispute those findings of fact relevant to the Fund's 35% Rule.

## III. Background

### A. The Multiemployer Pension Plan Amendments Act of 1980

In 1980, Congress amended the ERISA regulatory scheme by enacting MPPAA. The purpose of MPPAA as stated in the Conference Report was, in part, "to improve retirement income security under private multiemployer pension plans by strengthening the funding requirements

---

1. In addition to the several briefs filed by each party, I have considered also the parties' letter briefs of October 16, 1991 and October 23, 1991 and A & P's supplemental submission on the legislative history of Section 4205, dated October 17, 1991.

2. I held oral argument on the pending motions on October 9, 1991.

for those plans [and] to authorize plan preservation measures for financially troubled multiemployer pension plans." Conference Report, Multiemployer Pension Plan Amendments Act of 1980, 96th Cong.2d Sess. H.R. Report No. 96–1343 at 1; *see United Retail & Wholesale Emp. v. Yahn & McDonnell*, 787 F.2d 128, 130 (3d Cir.1986), *aff'd by an equally divided Court sub nom. Pension Ben. Guaranty Corp. v. Yahn & McDonnell*, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (purpose of MPPAA is "to discourage withdrawals from multiemployer pension plans and to ensure the solvency of such plans."). The MPPAA requires that an employer who completely or partially withdraws from the pension plan must compensate the plan for its withdrawal. The Act defines a partial withdrawal in Section 4205(a) of MPPAA, codified at 29 U.S.C. § 1385(a):

(a) Determinative factors

Except as otherwise provided in this section, there is a partial withdrawal by an employer from a plan on the last day of a plan year if for such plan year—

(1) there is a 70–percent contribution decline, or

(2) there is a partial cessation of the employer's contribution obligation.

Section 4205(b) defines a 70% contribution decline as having occurred in a plan year if in that year and the two preceding plan years (referred to in the Act as the three year testing period) the employer's contribution base did not exceed 30% of its contribution base units ("CBU") for the "high base year." The Arbitrator explained that in this case the contribution base unit within the meaning of Section 4001(a)(11) is an employee-month and that "a contribution of one month to the Fund on behalf of an employee, regardless of whether that contribution is made on behalf of a full-time or a part-time employee, is a single CBU." Interim Award at 14. The high base year is defined in Section 4205(b)(1)(B)(ii) of the Act as the average number of units for the two plan years for which the employer's contribution base units were the highest within the five plan years preceding the testing period.

The Act further requires that an employer which has partially withdrawn and been assessed for withdrawal liability must have its liability abated if it meets the requirements of the Act. The general reduction of partial withdrawal liability provision includes various triggers to reduce withdrawal liability, each based in whole or in part on "the number of contribution base units with respect to which the employer has an obligation to contribute." Section 4208(a)(1), codified at 29 U.S.C. § 1388(a)(1). The general provision also permits "the reduction or elimination of partial withdrawal liability under any conditions with respect to which the corporation determines that reduction or elimination of partial withdrawal liability is consistent with the purposes of this Act." Section 4208(e)(1), codified at 29 U.S.C. § 1388(e)(1).

The retail food industry, however, is subject to special rules under the Act. Section 4205(c), codified at 29 U.S.C. § 1385(c), provides:

(c) Retail food industry

(1) In the case of a plan in which the majority of the covered employees are employed in the retail food industry, the plan may be amended to provide that this section shall be applied with respect to such plan—

(A) by substituting "35 percent" for "70 percent" in subsections (a) and (b) of this section, and

(B) by substituting "65 percent" for "30 percent" in subsection (b) of this section.

(2) Any amendment adopted under paragraph (1) shall provide rules for the equitable reduction of withdrawal liability in any case in which the number of the plan's contribution base units, in the 2 plan years following the plan year of withdrawal of the employer, is higher than such number immediately after the withdrawal.

Section 4205(c)(3) exempts a retail food plan which has adopted a 35% amendment from the liability abatement rules applicable to plans which are not eligible for or which have not adopted a 35% rule.

## B. The Arbitrator's Decision as to the Fund's 35% Amendment

The parties' dispute centers on whether the abatement provision adopted by the Fund complies with the statutory language of the 1980 MPPA amendments to ERISA. Pursuant to 4205(c)(1), the Fund adopted the following abatement provision as part of its 35% Amendment:

> (b) If the number of Contribution Base Units for the Plan in each of any two consecutive Plan Years following the Plan Year of the Partial Withdrawal by an Employer is equal to or greater than such number for the Plan Year immediately following the Plan Year of the Partial Withdrawal, the Partial Withdrawal Liability payment of an Employer for a Plan Year subsequent to the Plan Year of such determination shall be the amount determined in accordance with (c) below.
>
> (c) The amount of Employer's Partial Withdrawal Liability otherwise payable for the Plan Year recalculated by substituting in the numerator of the fraction called for by Section 4206(a)(2) of the Act, the average of the Employer's Contribution Base Units for such two consecutive Plan Years in place of the Employer's Contribution Base Units for the Plan Year following the Plan Year in which the Employer's Partial Withdrawal occurred, if such average is higher than the Employer's Contribution Base Units for the Plan Year following the Plan Year in which the Employer's Partial Withdrawal occurred.

Interim Award at 21–22.

The abatement portion of the Fund's 35% Rule, quoted above, provides for a reduction of withdrawal liability when the number of Fund CBUs in each of any two consecutive plan years following the plan year of withdrawal is equal to or greater than the Fund's number of CBUs in the plan year immediately following the withdrawal. The amount of the employer's withdrawal liability payment for the Plan Year following those two consecutive years is based on the average of the employer's CBUs. *Id.* at 22–23.

The Arbitrator held that A & P had standing to challenge the 35% amendment adopted by the Fund. Interim Award at 88. The Arbitrator held that the Fund's Rule was invalid because the abatement provisions were inconsistent with the 4205(c)(2) requirement that any such amendment "provide rules for the equitable reduction of withdrawal liability" as that phrase was intended by Congress. *Id.* at 89. The Arbitrator held further that, as the Fund's abatement rule would be valid only if redrafted, that the Fund must be viewed as never having adopted a 35% Rule. *Id.* at 90. The Arbitrator found invalid all assessments based on the 35% Rule and held that they must be vacated. *Id.* at 90–92. Finally, the Arbitrator held that the Fund should refund to A & P the withdrawal liability payments made to the Fund with interest calculated in accordance with 29 C.F.R. Section 2644.3. *Id.* at 115.

## IV. *Discussion*

I agree with the Arbitrator's articulation of the issue in dispute: "The central question which needs to be decided in order to rule upon A & P's challenge to the Fund's 35% Rule is what was meant by Congress when it mandated that plans which adopt 35% retail food industry partial withdrawal provisions also adopt rules for the 'equitable reduction of withdrawal liability' in any case in which the number of the plan's CBUs in the 2 plan years following the plan year of withdrawal of the employer is higher than the CBUs of the plan immediately after withdrawal." Interim Award at 85–86. The Arbitrator's decision should be affirmed if he correctly interpreted the meaning of the statutory language. I will address in turn the Fund's arguments against the Arbitrator's decision.

### A. Meaning of Section 4205(c)(2)

#### 1. A & P's Standing to Challenge the 35% Amendment

■ The Fund objects to the Arbitrator's holding that A & P has standing to challenge the abatement portion of the Fund's 35% Rule. The Fund claims that A & P has not and will not suffer an injury suffi-

cient to confer standing. I will briefly explain the reasons underlying my affirmance of the Arbitrator's decision.

The standing requirements of Article III are well settled:

> The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party ... A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action ...'

*Contractors Ass'n of Eastern Pa., Inc. v. Philadelphia,* 945 F.2d 1260, 1264 (3d Cir. 1991) (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). The Fund contends that A & P has suffered no injury and is not within the class of employers adversely affected by the alleged defect in the portion of the Fund's 35% Rule which provides for the reduction of withdrawal liability. Defendant's Reply Brief in Support of Cross Motion to Vacate and Enforce Arbitration Award at 26. The Fund characterizes A & P's objection to the Fund's 35% Rule as based not on its own situation but on that of a hypothetical employer whose CBUs have not rebounded after a partial withdrawal when the CBUs for the fund as a whole have rebounded. *Id.* The Fund asserts that it is the hypothetical employer which would not necessarily receive an equitable reduction of withdrawal liability rather than A & P. *Id.* I disagree.

It is uncontested that A & P's CBUs declined by approximately 37% from its high base in 1982 and that the decline persisted through the three years of the testing period. *See e.g.,* Interim Award at 3, 22, 64, 87. The Fund's application of its 35% Amendment transforms that decline into a partial withdrawal. If the Fund's Amendment were not valid, the normal ERISA rules would apply and a decline of 70% would be required before A & P could be considered to have partially withdrawn from the Fund. Section 4208. As the validity of the partial withdrawal liability assessment against A & P pursuant to the Fund's 35% Amendment hinges on the va-

lidity of the Amendment, A & P has standing to challenge its validity. *Contractor's Ass'n,* 945 F.2d at 1264; *see* Hearing Tr. at 23–24. I am unpersuaded by the Fund's contention that A & P benefits rather than suffers from the abatement provisions of the Amendment since any assessments at all pursuant to an invalid Amendment also would be invalid. Defendant's Reply Brief at 28. I affirm also the Arbitrator's alternative reasoning that "even if the remedy for a lack of a valid abatement provision is not to void the entire Rule, but to modify the amount of abatement, A & P has a sufficient concrete interest in the matter to conclude that it has standing" to raise its claim. Interim Award at 88. The Arbitrator held that A & P's interest in the dispute was, at minimum, that the defect in the abatement provisions of the Fund's 35% rule significantly affected the amount of A & P's abatement, and at maximum, that the assessment was void and that the payments should be refunded with interest. *Id.*

2. Statutory Language

█ Under the normal ERISA rule, the determination of whether an employer has partially withdrawn and of whether its withdrawal liability should be reduced is correlated with the decline and rise, respectively, of the level of the employer's own CBUs. *See* Section 4205; Section 4208. Under the special rules governing plans in the retail food industry which adopt a 35% Amendment, the determination of whether an employer has partially withdrawn also is correlated to the employer's own CBUs. The trigger for abatement of the employer's partial withdrawal liability, however, depends not on the employer's CBUs but on the level of the Fund's CBUs. An amendment "shall provide rules" for abatement when "the number of the plan's contribution base units, in the two plan years following the plan year of withdrawal of the employer, is higher than such number immediately after the withdrawal." Section 4205(c)(2).

The plain language of the statute requires abatement in any case where the CBUs for the plan as a whole, measured

two years after the partial withdrawal, have not declined by as much as the withdrawn employer's. Section 4205(c)(2); Plaintiff's Brief in Opposition at 14. The mandatory language of the statute makes clear Congress' intent that, to be valid, an abatement provision must be triggered by the plan's level of CBUs when it has not declined by the same amount that the withdrawn employer's has declined.

The statute specifically exempts retail food plans which have adopted a 35% Amendment from the abatement rules applicable to unamended plans, which use the 70% scheme. *See* Section 4205(c)(3). The normal 70% reduction of partial withdrawal liability rule depends on the level of the employer's CBUs. *See* Section 4208; *supra* Section IIIA. The trigger for abatement under the 35% scheme depends on a plan's level of CBUs. *See* Section 4205. As the statute plainly requires different abatement rules in the 70% and 35% schemes, it is not appropriate to consider the level of employer CBUs when applying an amended 35% abatement rule.

■ I agree with the Arbitrator's conclusion that the Tri-State Fund's 35% Amendment is inconsistent on its face with the provisions of the Act. Under the Fund's 35% Amendment, the amount of abatement is completely independent of the Fund's overall CBUs which, as the Arbitrator held, "appears to conflict with the reasons for requiring abatement in the eventuality of a recovery in the CBUs of the Fund's contribution base." Interim Award at 87. Instead of referencing the plan's level of CBUs, the amount of abatement under the Fund's 35% Amendment is "wholly a function of the degree to which the Employer's CBUs have recovered to the average CBUs made during the five plan year period preceding the beginning of the 3 year testing period." *Id.* I affirm the Arbitrator's holding that the language of Section 4205(c)(2) as well as the Senate Joint Conference Report discussed below, "suggests that the basis for application of reductions in withdrawal liability in retail food industry rule partial withdrawals is the amount of change in the Fund's overall CBUs, not

the amount of change in the individual employer's CBUs to the Fund." *Id.* at 89–90.

3. Legislative History

The legislative history of MPPAA supports the view that the 35% Amendment adopted by the Fund does not comply with the statutory requirement that a 35% amendment "shall provide rules for the equitable reduction of withdrawal liability." Section 4205(c)(2).

■ The Fund is correct that a court interpreting MPPAA must be guided by canons of statutory construction, *Huber,* 916 F.2d at 97, and that the starting point for interpreting a statute is the language of the statute itself. Defendant's Reply Brief at 10 (citing *Smith v. Fidelity Consumer Discount Co.,* 898 F.2d 907, 909–10 (3d Cir.1989)). The Fund argues that I need not refer to the legislative history because the language of the statute is clear. *See e.g.,* Defendant's Reply Brief at 15–16. Since "equitable reduction of withdrawal liability" is not defined or explained elsewhere in the statute, the legislative history of the amendment is relevant to ascertaining Congressional intent. *See Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.,* 862 F.2d 1020, 1022 (3d Cir.1988), *cert. denied,* 490 U.S. 1082, 109 S.Ct. 2104, 104 L.Ed.2d 665 (1989) ("To determine intent, we must examine both the statutory language and the policy behind it."); *United States v. Parcel of Real Property,* 949 F.2d 73, 76–77 (3d Cir.1991) (resort to legislative history is appropriate where statute does not clearly provide an answer to the specific question). Indeed, the decision relied on by defendant held that "the plain meaning rule is 'an axiom of experience' and does not preclude consideration of persuasive legislative history if it exists." *Smith,* 898 F.2d at 910 (quoting *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981)).

In addition, the parties have not cited and I have not found a decision of any court construing the particular statutory language relevant to this case. The Arbitrator referred to the issue to be decided as "one of first impression." Interim Award at 85; *see Bryant v. Riddle Memorial*

*Hospital,* 689 F.Supp. 490, 491 (E.D.Pa. 1988) ("In construing a statute in a case of first impression, the court looks first to the language of the statute itself, then to its legislative history."). The Fund asserts accurately that equity is a broad and flexible concept. *See e.g.,* Defendant's Memorandum of Law in Opposition to A & P's Motion at 24 and 33; Defendant's Reply Brief at 27. Legislative history therefore is useful to determine what goals Congress had in mind in using the phrase "equitable reduction."[3] A decision relied on by the Fund is instructive. *See U.S. v. R.W. Meyer, Inc.,* 932 F.2d 568, 572 (6th Cir.1991) (relying on legislative history to explain Congressional intent by reference in CERCLA to "such equitable factors as the court determines are appropriate"). Finally, as I explain below, the Fund itself relies repeatedly on legislative history in its submissions to the Court. I therefore rely on the relevant legislative history.[4]

The Conference Report of the MPPAA and the Joint Explanatory Statement of the Committee of Conference together are only four pages. H.R.Rep. No. 96–1343, 96th Congress, 2d Sess. (Sept. 18, 1980) U.S.Code Cong. & Admin.News 1980, p. 2918; *see* 126 Cong.Rec. S26040 (Sept. 18, 1980); H26219 (order to be printed); H26361 (Sept. 19, 1980) (floor debate; refers to order to be printed). Neither the Report nor the Statement refer to the relevant statutory provision. A & P contends that "[i]n the absence of a meaningful conference report," I should rely on the last comprehensive report on MPPAA, the Joint Explanation of S.1076 of the Senate Committees on Finance and Labor and Human Resources ("Joint Explanation"). Letter to Court from Counsel to A & P at 2 (October 17, 1991); *see* Plaintiff's Brief in Opposition at 26. Despite its argument that I should not rely on legislative history, the Fund

repeatedly cites the legislative history of MPPAA in its briefs. *See e.g.,* Defendant's Memorandum in Opposition at 6, 7, 32–33, 41; Defendant's Reply Brief at 4. In fact, the Fund relies specifically on the Joint Explanation, the joint committee report relied upon by A & P, including that report's articulations of the policy underlying the MPPAA statutory scheme. *See* Defendant's Memorandum of Law in Opposition at 6; *see e.g., id.* at 7, 32–33; Defendant's Reply Brief at 4.

The Joint Explanation, which was entered into the Congressional Record on the day the Senate passed the MPPA amendment to ERISA, explains that Congress intended that employers subjected to partial withdrawal liability after a withdrawal of only 35%, rather than 70%, were entitled in return to have that liability reduced by rules different than those governing the abatement of liability caused by a 70% reduction. 126 Cong.Rec. S20193 (July 29, 1980). The Joint Explanation states:

A more restrictive partial withdrawal rule is provided for the retail food industry at the request of representatives of both labor and management in that industry. This rule would treat as a partial withdrawal a diminution of the contribution base of 35 percent, rather than 70 percent, computed in the same manner as under the general rule. *Because this rule would impose partial withdrawal liability more frequently than the general rule in the bill, the Committees require that it be accompanied by plan rules providing for proportional reduction of liability if the plan's contribution base does not decline by as many base units as the partially withdrawn employer's.*

Senate Comms. on Finance and Labor and Human Resources, Joint Explanation of S.

---

3. The Fund urges that the use of the word "equitable" in various other statutes should determine how to construe it in this case. *See e.g.,* Defendant's Letter to Court, October 16, 1991. I find that the legislative history of MPPAA, a highly technical statute, is a more persuasive guide to the intent of Congress than Congressional use of the word "equity" in the contexts of other statutes unrelated to ERISA.

4. For these reasons, I am not persuaded by the Fund's argument that use of the word "proportional" elsewhere in the statute precludes examination of the legislative history of 4205(c). *See* Defendant's Reply Brief at 18 (relying on *Huber,* 916 F.2d at 101).

1076: Multiemployer Pension Plan Amendments Act of 1980, 96th Cong., 2d Sess. (1980), 126 Cong.Rec. S20189, S20193 (July 29, 1980) (emphasis added).

Congress enacted 4205(c) as it appeared in Senate Bill 1076, the text of which was published in the Congressional Record on the same day as the Joint Explanation. *See* 126 Cong.Rec. 20148 (July 29, 1980) (text of S.1076 printed). The Joint Explanation, therefore, is based on the language of 4205(c) as it appears in the statute. The Fund's contention that the provisions described in the Joint Explanation may not be identical to the law which was enacted therefore is not valid. *See* Defendant's Reply Brief at 16, n. 3; Plaintiff's Letter to Court, October 17, 1991.[5]

A & P is correct that the Courts of Appeals for at least five Circuits, including that for the Third Circuit, have relied on the Joint Explanation, at least in part, as authoritative legislative history for the MPPAA. *See Trustees of Amalgamated Ins. Fund v. Sheldon Hall Clothing, Inc.,* 862 F.2d 1020, 1022 (3d Cir.1988), *cert. denied,* 490 U.S. 1082, 109 S.Ct. 2104, 104 L.Ed.2d 665 (1989) (relying also on House Committee Report No. 869, Pt. I, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S.Code Cong. & Admin.News 2918); *Combs v. Classic Coal Corp.,* 931 F.2d 96, 100 (D.C.App.1991) (same); *Cent. States Southeast & Southwest Areas Pension Fund v. T.I.M.E.-D.C., Inc.,* 826 F.2d 320, 321, 325 (5th Cir.1987) (same); *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.,* 789 F.2d 98, 102 (2d Cir.1986) (same); *Chase v. Trustees of Western Conference of Teamsters Pension Trust Fund,* 753 F.2d 744, 750 n. 5 (9th Cir.1985) (same and relying also on statement of Senator Williams). At least two Courts of Appeals have cited the Joint Explanation alone as the legislative history of the MPPAA. *See Granada Wines, Inc. v. New England Teamsters & Trucking Industry Pension Fund,* 748 F.2d 42, 45 (1st Cir.1984); *Peckham v. Bd. of Trustees,* 719 F.2d 1063, 1065 (10th Cir.), *modified,* 724 F.2d 100 (10th Cir.1983).[6]

The Joint Explanation is useful in this case because it comments specifically on the language of 4205(c) as it was finally enacted. In addition, I agree with the Arbitrator that the concept of proportionality in the Joint Explanation is consistent with the language of the statute. Interim Award at 86. The statute contemplates that the CBUs of the plan will decline by same amount that the withdrawing employer's declines and that, if the plan recovers from that drop, the employer's liability then should be abated. Similarly, the Joint Explanation explains that the employer's liability should be proportionately reduced "if the plan's contribution base does not decline by as many base units as the partially withdrawn employer's." Joint Explanation, 126 Cong.Rec. at S20193.

The theory underlying the enactment of the MPPAA provision permitting retail

---

**5.** The Fund argued in a supplemental letter brief to the Court that "equitable reduction" cannot be construed to mean "proportionate reduction" because a Nevada district court construing federal regulations regarding grazing privileges found that "equitable" did not have that meaning in that context. Defendant's Letter to Court, October 16, 1991 (citing *Bunyard v. Hodel,* 702 F.Supp. 820 (D.Nev.1988)). The legislative history of the MPPAA statute is more relevant to this case than the Nevada decision.

**6.** Some district courts also have relied on the Joint Explanation as the authoritative legislative history of the Act. *See e.g., Central States Southeast and Southwest Areas Pension Fund v. Rymer Co.,* 1987 WL 9593, 1987 U.S.Dist. LEXIS 3009 (N.D.Ill. April 10, 1987); *Combs v. Pelbro Fuel, Inc.,* C.A. No. 83-1524 (D.D.C. November 15, 1984), slip op. at 6, 1984 WL 3230.

In other decisions, however, Courts of Appeals, including that for the Third Circuit, have referred to the legislative history of MPPAA without reference to the Joint Explanation. *See e.g., United Retail & Wholesale Emp. v. Yahn & McDonnell,* 787 F.2d 128, 130, 141 (3d Cir.1986), *aff'd by an equally divided Court sub nom. Pension Ben. Guaranty Corp. v. Yahn & McDonnell, Inc.,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (relying on H.R.Rep. No. 869); *Anita Foundations, Inc. v. ILGWU Nat. Retirement Fund,* 902 F.2d 185, 188 (2d Cir.1990) (same); *In re Michigan Carpenters Council Health & Welfare Fund,* 933 F.2d 376, 390 (6th Cir.), *cert. denied sub nom. Charles Rogers Constr. v. Trustees, MI Carpenters,* —— U.S. ——, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991) (same and relying on statement of Rep. Thompson).

food plans to adopt 35% amendments supports the view that a valid amendment must provide rules for employer abatement proportional to the Fund's recovery from the withdrawal. *See also infra* Section IV B 1 and Section IV B 3. Relying upon testimony before Congressional hearings on the MPPAA, the Arbitrator found that Congress adopted the 35% exception for the retail food industry in recognition of the special characteristics of that industry.[7] Specifically, the Arbitrator found that Congress adopted the special rule "following representations from industry and union spokespersons that the unique characteristics of the retail food industry required focus, for abatement purposes, upon the CBUs of the plan as a whole rather than simply upon changes of the CBUs of the individual contributing employers." Supplemental Opinion at 19; Interim Award at 72–74 (quoting excerpts from Congressional testimony by United Food and Commercial Workers Union and Food Marketing Institute in context of summary of employer's contentions). Congress heard testimony that retail food employers frequently enter and exit from particular markets and that, because most market voids created are filled in whole or in part by other employers, the level of CBUs in the pension plans in the industry may be unaffected. Interim Award at 72–73; *id.* at 86; Hearing Tr. at 11–13.

The Joint Explanation is consistent with the statute and the theory underlying Congress' adoption of special rules for the retail food industry. I therefore affirm the Arbitrator's application of the language of the Joint Explanation to this case. I agree with the Arbitrator's conclusion that the Fund's 35% Amendment fails to comply with the requirements of the statute. Briefly, the Fund's Amendment bases abatement on the employer's own CBUs rather than on the Fund's recovery from the employer's partial withdrawal, which is inconsistent with the statutory language, the theory underlying the statute and the legislative history of MPPAA.[8] As the Arbitrator pointed out in his Supplemental Opinion, Congress intended the abatement provisions under the special retail food industry option to be distinct from the normal rule under Section 4208, which focuses on changes in the CBUs of the individual employer. Supplemental Opinion at 19. For this reason, the Fund's argument that its 35% Rule requires the employer to contribute to the Fund's recovery before abatement and that "this approach is consistent with Section 4208" is unpersuasive. Defendant's Memorandum in Opposition at 35. As I find a 35% amendment can be valid only when it contains an abatement rule providing "for proportional reduction of liability if the plan's contribution base does not decline by as many base units as the partially withdrawn employer's," I find the Fund's 35% Amendment is .not valid.[9] Joint Explanation, 126 Cong.Rec. at 20193.

The Fund objects to the Arbitrator's reliance on certain letters issued by Pension Benefit Guaranty Corporation disapproving the 35% rule amendments proposed by plans other than the Tri–State Fund. *See* Interim Award at 68–72, 87; *see e.g.,* Defendant's Reply Brief at 32. The Fund argues that the Arbitrator should not have

7. The Fund correctly asserts that in the testimony relied on by the Arbitrator the representatives of the union and employers were not commenting on proposals for the abatement of withdrawal liability. *See, e.g.,* Defendant's Reply Brief at 18–19. The statements are nevertheless relevant to an understanding of the theory behind the adoption of the special retail food rule, Section 4205(c). As the special rule and its abatement provision incorporated the two ideas stressed in the testimony, the uniqueness of the retail food industry and the need for the statute to protect against reductions in the plan's contribution base, I find the Arbitrator's reliance on the statements to have been proper. *See* Section 4205(c); *infra;* Section IV B 3.

8. *See infra* Section IV B 1 for further discussion of the policy underlying MPPAA.

9. Contrary to the Fund's assertion, A & P does not argue that an employer's liability should be calculated in a way that violates Section 4206(a)(2), the provision that governs the calculation of liability for an employer's partial withdrawal. Defendant's Reply Brief at 14. Rather, A & P's argument regarding proportional reduction pertains to reduction of liability, not to the initial calculation of partial withdrawal liability. As the reduction of partial withdrawal liability is not governed by Section 4206(a)(2), the Fund's contention is not persuasive.

relied on these letters because the PBGC subsequently issued blanket approvals of the 35% rule amendments adopted by all plans. Defendant's Memorandum in Opposition at 41.

I need not reach this issue because without considering the effect of the PBGC letters I have concluded that the Fund's 35% Amendment does not comply with the statute. However, I agree with the Arbitrator's decision regarding the letters. The PBGC letters disapproving the other 35% rule amendments discussed specifically the facial noncompliance of those particular amendments with the language of the statute. The subsequent blanket approvals are not inconsistent with the prior letters because, as the Arbitrator explained, the PBGC can disapprove of amendments only for limited reasons. Except for verifying that the particular amendment included an abatement rule and that the trigger for abatement was based on the proper period of time, the PBGC review " 'does not ... constitute a ruling on whether the amendment is consistent with ERISA....' " Interim Award at 71 (quoting letter from PBGC General Counsel).

### B. Application of Abatement Provision

1. Under a Valid Abatement Provision, A & P Would be Entitled to a Full Abatement [10]

█ The Fund contends that the Arbitrator's decision violates the plain meaning of Section 4205(c) by improperly requiring a complete elimination of partial withdrawal liability rather than the "equitable reduction of withdrawal liability" prescribed by the statute. See, e.g., Defendant's Reply Brief at 10–14. The Fund argues that if the Arbitrator's reliance on the legislative history of MPPAA was proper he was wrong to interpret "proportional reduction" to require a complete abatement of A & P's withdrawal liability under a valid abatement provision. Id. at 15–17. I disagree.

It is uncontested that the CBUs for the Fund have steadily increased every year since 1982. Interim Award at 87. The number of the Fund's CBUs was higher in the two plan years following the year of withdrawal than it was immediately after the withdrawal, a fact which triggered abatement. Since the Fund's CBUs did not decrease at all in the wake of A & P's partial withdrawal, when examined two years later, the Fund's "recovery" was complete. The abatement therefore should be complete. The Arbitrator correctly held that "under any reasonable and equitable proportional approach, the withdrawal liability of A & P should have completely abated, at least as of January 1, 1987, if not sooner." Interim Award at 88.

The Fund claims that the Arbitrator's interpretation of proportional reduction encourages withdrawal and penalizes employers who remain with or join the Fund, thereby violating the fundamental purposes of the MPPAA. Defendant's Memorandum in Opposition at 30–33; Defendant's Reply Brief at 20–21. On the contrary, I find that the policies underlying the MPPAA are served by the Arbitrator's decision. Congress enacted the MPPAA to discourage withdrawals and to ensure the solvency of multiemployer pension plans. See Yahn & McDonnell, 787 F.2d at 130; Anita Foundations, 902 F.2d at 188 ("MPPAA was designed to strengthen the financial security of multi-employer pension plans"). Under Section 4205(c), a plan is permitted to adopt the partial withdrawal test of a 35% decrease in an employer's CBUs, which will occur more frequently than the normal test of a 70% decrease, if the plan also adopts the quid pro quo of an equitable abatement rule. See Section 4205(c)(2). Under the 35% amendment, abatement of partial withdrawal liability is triggered by the recovery of the plan's CBU level and the amount of equitable abatement is proportional to the plan's recovery. Only if the plan's level of CBUs

---

10. Ordinarily I would not reach this issue because the Fund is not required to adopt a 35% amendment and has not adopted a rule other than the one which I have held invalid. I reach the issue in this case because the Fund contends

that, in deciding that the Fund's rule was inconsistent with the statute, the Arbitrator interpreted the statute to require a full abatement in every instance where abatement would be due.

has recovered completely from the employer's withdrawal would the employer's abatement be complete. In this way, the policy of ensuring the solvency of the plan is furthered.

2. The Arbitrator's Decision Does not Equate Equitable Abatement with Complete Abatement

██ The Fund contends that the Arbitrator's interpretation of equitable reduction would result in complete abatement of withdrawal liability every time abatement is required. *See, e.g.,* Defendant's Memorandum in Opposition at 29–31. I disagree.

The Arbitrator did not hold, as the Fund claims, that complete abatement is due when a plan's CBUs are higher two years after withdrawal than they were immediately after the withdrawal. Defendant's Memorandum in Opposition at 28; Interim Award at 87–88; Supplemental Interim Award at 20. The Fund misstates the Arbitrator's holding as having been that an "'equitable reduction of withdrawal liability' ... requires an elimination or 'complete abatement' of withdrawal liability when the plan number of CBU's increases in the two years following the withdrawal." Defendant's Memorandum in Opposition at 2; *see* Defendant's Reply Brief at 10–12. Had the Arbitrator so held, he would have incorrectly confused the event which causes abatement with the circumstances under which that abatement should be complete.

Rather, the Arbitrator held that the trigger for abatement of withdrawal liability and the measure of that abatement were separate but that, in this case, the abatement under a valid provision would be complete. Interim Award at 86–88. The Arbitrator held correctly that abatement is triggered by the plan's recovery from the employer's withdrawal or, in the language of the statute, when "the plan's [CBUs], in the 2 plan years following the plan year of withdrawal of the employer, is higher than such number immediately after the withdrawal." Section 4205(c)(2); Interim

Award at 87. The Arbitrator held that the measure of abatement, the "equitable reduction of withdrawal liability," once triggered by the plan's recovery, depends on the extent of the plan's recovery from the employer's withdrawal. Interim Award at 86–88. Abatement should be granted in proportion to the plan's recovery. *Id.* at 87.

Proportional abatement of employer withdrawal liability is based on the extent to which the Fund's level of CBUs has rebounded, at two years after the withdrawal, from its post-withdrawal level as compared with its pre-withdrawal level. Supplemental Opinion at 20; Hearing Tr. at 18, 20–22. Since the determination of employer withdrawal involves a three year testing period, the relevant comparison is the level of the Fund's CBUs prior to the three year testing period with the level of CBUs two years after the plan year of withdrawal. *See* Section 4205(c); Supplemental Opinion at 20; Hearing Tr. at 18, 20–22; Appendix A (chart submitted by A & P). Contrary to the Fund's contention, proportional abatement will result in complete abatement only where the level of fund CBUs two years after the plan year of withdrawal is equal to or greater than the fund's level of CBUs prior to the three year testing period which culminated in the employer's partial withdrawal.[11] Section 4205(c); Supplemental Opinion at 20; Joint Explanation, 126 Cong.Rec. at 20193; Hearing Tr. at 20–22. As the Fund's CBUs have increased steadily since 1982, the Arbitrator properly found that in this instance abatement should be complete under a valid abatement provision. *See* Interim Award at 87–88.

Contrary to the Fund's assertion, the above circumstance should result in a complete abatement of partial withdrawal liability rather than a failure to incur partial withdrawal liability. *See* Defendant's Reply Brief at 14. Nor does A & P claim otherwise. *See* Plaintiff's Brief in Opposi-

---

**11.** In this regard, the Fund is correct that, under proportional abatement, a plan's CBU's would have to "remain depressed" for five years. The Fund is not correct, however, that either the statute or the Arbitrator's decision requires that the plan's CBU's not have rebounded at all in order for a Fund to assess or collect any partial withdrawal liability. *See infra* at n. 12.

tion at 27–29; *id.* at 26 (arguing that under these circumstances 100% abatement is due). Again contrary to the Fund's assertion, the comparison relevant to the measure of abatement is the level of Fund CBUs prior to the employer's decline with the level of Fund CBUs two years post-withdrawal. *See* Supplemental Opinion at 20; Hearing Tr. at 18, 20–22. The Fund's claim that the Arbitrator's decision would result in complete abatement "in any case in which the plan's level of CBUs increase after the withdrawal" is based on a comparison of the Fund's CBUs immediately after the employer's withdrawal with that level two years after the employer's withdrawal. Defendant's Reply Brief at 11. The Fund is correct that "the increase in the plan's CBUs for two years simply triggers an equitable reduction of that withdrawal liability; it does not define the amount of the reduction." *Id.* at 6.

Despite its proper distinction between the trigger for and measure of abatement, the Fund misinterprets the Arbitrator's decision as reducing the two inquiries to one. *See e.g.,* Defendant's Memorandum in Opposition at 19, 22–24. The Fund states:

> By definition, the CBUs for the plan will be higher in the two years following the plan year of withdrawal (i.e., more than 100%) than they were 'immediately after the withdrawal' or there is no reduction of withdrawal liability. For example, when a fund's level of CBUs increase by only 1% in the two years after the withdrawal, its level of CBUs will still be higher (101%) in those two years than

they were immediately after the withdrawal.

Defendant's Reply Brief at 12. I do not read the Arbitrator's decision as equating the trigger for reduction with the measure of reduction because, as I explained above, the two inquiries require that the Fund's level of CBUs two years after the employer's withdrawal be compared with two different points: first with the level immediately after withdrawal and then with the level prior to the employer's decline.[12] Supplemental Opinion at 20; Hearing Tr. at 20–22. Moreover, since the language of the statute links the trigger for abatement of employer withdrawal liability with the level of the Fund's CBUs rather than the employer's CBUs, the Fund's contention that the Arbitrator's decision improperly penalizes employers who join or remain in the Fund by requiring them to subsidize A & P's withdrawal liability is not persuasive.

**3. The Arbitrator Did Not Apply a Proposal Rejected by Congress**

The Fund claims also that the Arbitrator's decision adopts a proposal rejected specifically by Congress. *See e.g.,* Defendant's Reply Brief at 2–3, 19. It is true that Congress was urged to adopt a rule that an employer should not be assessed for a partial withdrawal if, at the end of the second year after the partial withdrawal, the CBUs of the plan had not declined. *See* Plaintiff's Brief in Opposition at 17. The proposed rule, jointly sponsored by the United Food and Commercial Workers Un-

---

12. The futility of discussing a change in the level of the Fund's CBU's without specifying which two periods are being compared is illustrated by the Fund's critique of A & P's interpretation of the meaning of "proportional reduction of liability." In its Reply Brief, the Fund claims that a graph submitted by A & P, *see* Plaintiff's Brief in Opposition at 27, and based on the Arbitrator's factual findings, *see* Interim Decision at 14–15, shows that "the fund level of CBU's increased by 13%" and that a reduction of liability proportional to that increase would "'reduce' A & P's liability proportionately by 13%." Reply Brief at 24. The 13% increase illustrated by the graph is based on a comparison of the Fund's level of CBU's in 1981, before A & P's store closings, and in 1988, four years after the employer's partial withdrawal. These

two periods, however, are not the two periods to be compared in order to determine either whether an abatement is due or what the amount of the abatement should be.

Rather, as stated above, the two periods relevant to the trigger for abatement are the year of withdrawal and two years later; and the two periods relevant to the amount of the abatement are two years after the year of withdrawal and the year before the testing period began. The 13% increase referred to by the Fund demonstrates that the Fund had not only "recovered" from the impact of A & P's partial withdrawal, but also its level of CBUs four years after the partial withdrawal surpassed its level prior to A & P's store closings. In other words, the Fund's CBUs had rebounded to more than 100%.

ion and the Food Marketing Institute would have provided that:

(a) A withdrawal that does not have an actuarial impact on the plan because of subsequent events (new entrants or hiring of laid-off employees by other contributing employers, for example) should not create liability;

(b) The demand for withdrawal liability by the plan should be postponed until the end of the second plan year after [the] year in which the withdrawal occurred, with the posting of a bond to protect the plan until the liability is demanded;

(c) If at the time of demand, the contribution base units of the plan have not decreased since the withdrawal, the withdrawing employer should be required only to post bond for the amount of the otherwise applicable withdrawal liability . . .

*Multiemployer Pension Plan Amendments Act: Hearings on HR 3904 Before the Comm. on Ways and Means*, 96th Cong., 2d Sess. 80 (Feb. 4, 1980); *see* Defendant's Memorandum in Opposition at 31 (quoting Hearings on S. 1076 urging same amendment). Congress did not adopt the above proposal. However, Congress did retain the concept of measuring the impact of the employer's 35% decline on the plan's CBUs two years after the withdrawal. Instead of postponing the withdrawal, Congress formulated the concept in terms of abatement. The Arbitrator's decision is consistent with Congress' intent as expressed in the statute and the legislative history. *See* Plaintiff's Brief at 18 n. 11.

The Fund improperly characterizes the rejected amendment as a plan to eliminate partial withdrawal liability when the number of the plan's CBUs increases in the two years following the withdrawal and contends that the Arbitrator applied the rejected rule as characterized by the Fund. *See* Defendant's Memorandum in Opposition at 30–31; Defendant's Reply Brief at 2–3, 19. For the reasons set forth in the discussion above regarding the Fund's argument that the Arbitrator equated abatement with

complete abatement, I am not persuaded by the Fund's contention.

4. Rules for the Equitable Reduction of Withdrawal Liability

The Fund contends that the measure of an equitable reduction of withdrawal liability "depends upon a flexible balancing of all the equities in light of the totality of the circumstances, including the harm to other employe[rs]." Reply Brief at 27 (citing *Meyer*, 932 F.2d at 572); *see* Defendant's Memorandum in Support of its Cross Motion at 33 (same); Hearing Tr. at 61 (same and citing *Charles v. Charles*, 788 F.2d 960 (3d Cir.1986)). As I am not persuaded by the Fund's argument, I will affirm the Arbitrator's holding that a valid 35% amendment should not include a post-hoc determination of what an equitable abatement should be but, in the language of the statute, "shall provide rules for the equitable reduction of withdrawal liability." Section 4205(c)(2).

The Arbitrator found that the statute's use of the word "rules" precludes the case-by-case approach urged by the Fund. The Arbitrator reasoned:

I am not persuaded that the inclusion in Section 4205(c)(2) of the phrase 'equitable reduction of withdrawal liability' was intended to reference the specific facts and circumstances surrounding the partial withdrawal and the overall financial condition of the plan. To accept such an approach would place little guidance upon the contours of an abatement rule and result in a determination after the fact of whether particular abatement was or was not 'equitable.' Instead, I believe that Congress must have intended that plans adopt abatement rules which were 'equitable' in design, rather than focusing upon whether the application of those abatement rules resulted in equitable reductions in withdrawal liability.

Interim Award at 88–89.

The Arbitrator's reasoning is consistent with the statute. The requirement that an

amendment provide "rules" demonstrates that the statute contemplates that equity be measured prospectively rather than retrospectively as urged by the Fund. Nor does the Fund explain how it could promulgate a generally applicable abatement rule which would anticipate each of the individualized circumstances of this Plan, including the withdrawals of other employers and the Plan's status as a plan in reorganization. Defendant's Memorandum in Opposition at 33–34; Defendant's Reply Brief at 27–28. I consequently reject the Fund's argument that the calculation of equitable abatement should be based on consideration of all of the circumstances surrounding the withdrawal, including, without limitation, whether A & P's partial withdrawal had an adverse impact on the Fund despite the steady increase in the Fund's level of CBUs.

Congress chose to correlate the trigger for abatement with an increase in the Fund's level of CBUs, not an overall assessment of actuarial harm. Nor does the statute distinguish between full time and part time CBUs. Section 4205(c)(2); Supplemental Opinion at 20. The Fund's argument that actuarial harm can exist despite an increase in the level of CBUs therefore "provide[s] no basis for modifying the statutory calculations" and scheme of abatement. Supplemental Opinion at 20; *see* Interim Award at 88; Defendant's Memorandum in Opposition at 32–38.

Nor do the cases relied on by the Fund persuade me that an inquiry into the totality of the circumstances is necessary in this case. The use of the word "equitable" is different in the MPPAA context than in the CERCLA context addressed in *Meyer* or in the Virgin Islands divorce statute context addressed in *Charles.* The MPPAA statute requires "rules for the equitable reduction." Section 4205(c)(2). In both *Meyer* and *Charles,* the statutory reference to equity was not so restricted. The Courts in *Charles* and *Meyer* construed the phrases "the court which grants [a divorce] shall

make disposition of the homestead in accordance with the equity of the case," *Charles,* 788 F.2d at 964, and "the court may allocate response costs ... using such equitable factors as the court determines are appropriate." *Meyer,* 932 F.2d at 572.

In neither *Meyer* nor *Charles* was the statute's reference to equity restricted by a requirement that equity be measured prospectively as I have held is required by the MPPAA statute. Indeed, the legislative history relied on by the Court in *Meyer* mandated that courts "resolve claims for apportionment on a case-by-case basis ... taking relevant equitable considerations into account." 932 F.2d at 572 n. 3. The MPPAA statute does not so provide. Under the MPPAA statute, a proper abatement provision would not direct abatement on a case-by-case basis but should provide a generally applicable abatement rule. The language of the MPPAA statute is a more persuasive guide to the intent of Congress in that specialized context than is legislative use of the word "equity" in contexts unrelated to ERISA.

5. Severability

■ The Fund contests the appropriateness of the Arbitrator's recommended solution for the failure of the Fund's 35% amendment to provide rules for the equitable abatement of withdrawal liability. The Fund argues that, even if I find that its 35% amendment does not comply with the statute, the Arbitrator erred in nullifying the whole 35% amendment. Defendant's Reply Brief at 29. Rather, the Fund argues that I should nullify only the abatement portion of the Fund's 35% amendment. The Fund urges the analogy that, just as a statute should not be struck down completely for containing an unconstitutional provision, a presumption of severability should apply to the invalid abatement provision of its 35% amendment. *Id.* at n. 8.

I do not accept the Fund's analogy. Underlying the presumption of severability are separation of powers concerns. *Yahn v. McDonnell,* 787 F.2d at 142, *aff'd by equally divided Court sub nom. Pension*

*Ben. Guaranty Corp. v. Yahn & McDonnell,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987). The Fund is not the legislative branch of government and their enactments should not be accorded the deference due a statute.

If the Fund's analogy were apt, I would not be persuaded by its argument. The decision principally relied on by the Fund supports the Arbitrator's award and A & P's position that the 35% amendment should be treated as a nullity. In *Yahn & McDonnell,* the Court of Appeals for the Third Circuit held since a "ruling of unconstitutionality frustrates the intent of the elected representatives ... a court should refrain from invalidating more of the statute than is necessary." *Yahn & McDonnell,* 787 F.2d at 142 (quoting *Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984)). In *Yahn & McDonnell,* the Court held that the presumption in favor of severability requires "that we sever the provision which is least central to Congress' scheme." *Id.; see* Reply Brief at 29, n. 8. The Court relied on the test for severability articulated in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976):

> Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as law.

*Yahn & McDonnell,* 787 F.2d at 142 (quoting *Buckley,* 424 U.S. at 108–09, 96 S.Ct. at 677).

As the Arbitrator explained, however, the MPPAA statute requires that any 35% Amendment enacted by a Fund "shall provide rules for the equitable reduction of withdrawal liability." Section 4205(c)(2). The statutory language is mandatory. The abatement provision is central to the Con-

gressional scheme. Without rules for equitable reduction, the 35% test may not be "fully operative." *Buckley,* 424 U.S. at 108–09, 96 S.Ct. at 677. Under the rule of *Yahn & McDonnell,* therefore, the abatement provision of the Fund's 35% Amendment is not severable from the remainder of the amendment. Having agreed with the Arbitrator that the abatement provision is invalid, I must agree also with the Arbitrator's decision to strike the whole of the Fund's 35% amendment.

### C. Refund of A & P's payments of withdrawal liability

■ The sole remaining issue is whether A & P is entitled to immediate payment. I find, for the reasons set forth by the Arbitrator, that the Fund should refund the payments made by A & P.[13] I affirm the reasoning and conclusion of the Arbitrator, who held:

> I am persuaded that the most appropriate course is to direct that the fund refund to A & P the withdrawal liability payments made to date to the Fund, with interest, calculated in accordance with the approach contained in 29 CFR Section 2644.3. This total refund is grounded upon my earlier finding that the only assessment of withdrawal liability issued to date by the Fund was based upon a plan amendment which failed to include a valid 35% food industry partial withdrawal abatement rule and my conclusion that, absent such an abatement rule, the entire 35% food industry partial withdrawal amendment must be viewed as inconsistent with Section 4205. Absent adoption of such a rule, there can be no finding that A & P had a partial withdrawal from the Fund unless a showing is made that there was a 70% contribution decline after applying Section 4212(c) of the Act.

Interim Award at 115.

---

**13.** As my decision regarding the refund of payments to A & P is rendered simultaneously with affirmance of the remainder of the Arbitrator's Interim Award, I need not reach A & P's claim that a refund should be required prior to judicial review of the Arbitrator's award. *See* Brief of A & P on Entitlement to Immediate Refund.

The Fund urges that the appropriate remedy is to require the Fund to adopt a provision which does comply with the statute.

The Arbitrator found that the Fund's abatement rule could not be cured simply by striking certain portions or by changing the interpretation of the plan language but would require redrafting in order to comply with the statute. Interim Award at 90. He held that he could not supply the Fund with a selection of acceptable abatement provisions because to provide such advice would be "outside the legitimate role of the Arbitrator." Supplemental Interim Award at 21.

I am not persuaded by the Fund's view that the Arbitrator's powers under MPPAA would permit him to redraft the amendment. The decisions relied on by the Fund do not support its position. Defendant's Memorandum in Opposition at 38, 43–44; Defendant's Reply at 34. In *Advest, Inc. v. McCarthy*, 914 F.2d 6, 10–11 (1st Cir. 1990), the Court was not concerned with an MPPAA or ERISA arbitration. The power of an arbitrator is not discussed in either *Marvin Hayes Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund*, 814 F.2d 297 (6th Cir.1987) or *Loomis Armored, Inc. and Central States Pension Fund*, 8 EBC 1899 (Tilove, 1987). Further, the Arbitrator's decision in *Don Hutson, Inc. and Central States Pension Fund*, 8 EBC 2319 (Dreyer, 1987) supports the view that an arbitrator's powers under MPPAA are not as broad as the Fund argues:

> Nothing in the statute [MPPAA] or the regulation [PBGC regulation, 29 C.F.R. Part 2641] grants the arbitrator any equitable power. To the contrary, the arbitrator's sole function is to review the correctness of a plan's withdrawal liability determinations under sections 4201 through 4219 of ERISA.

*Id.* at 2327.

The Arbitrator also rejected the Fund's proposal that the defective rule be remanded to the Fund. The Fund has not brought to the attention of the Court any decision where a remand was ordered under circumstances similar to those in this case. The decisions in *Marvin Hayes, Loomis, Hutson* and *National Stabilization Agreement of the Sheet Metal Industry Trust Fund v. Commercial Roofing and Sheet Metal*, 655 F.2d 1218 (D.C.Cir.1981), *cert. denied sub nom. D.W. Browning Contracting Co. v. National Stabilization Agreement*, 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982) do not address the issue of a remand to a fund.

In *Marvin Hayes*, the Court was concerned with whether an employer should make interim payments pending the Arbitrator's consideration of whether a fund had dated the withdrawal correctly in its demand for payment. *Marvin Hayes*, 814 F.2d at 300. The issue was whether the fund's failure to use the proper date should nullify the request for withdrawal payments. *Id.* The Court held that Congress intended "to secure the funds as soon as possible and iron out the details and disputes later." *Id.* at 301. Unlike this case, the Court in *Marvin Hayes* had not found that the fund made the assessment pursuant to an invalid rule nor was the fund's authority to make the assessment challenged. *Marvin Hayes* therefore does not support a remand to the Fund here, where the plan itself would require amendment. Nor does the Arbitrator's reference in *Hutson* to corrections of a fund's determinations of withdrawal liability support the Fund's position. *Hutson*, 8 EBC at 2327. In his decision, the Arbitrator distinguished the cases cited by the Fund in support of a remand by the magnitude of the issue to be remanded:

> There is a meaningful distinction between recalculating UVB liabilities or asset values on the basis of different methods or assumptions, using different data, or using a different date of withdrawal, on the one hand, and amending the plan to eliminate a conflict between the plan provision and the Act.

Interim Award at 91.

The Arbitrator found that a remand to the Fund to redraft its rule would be futile in this case because "under any reasonable and equitable proportional approach, the withdrawal liability of A & P should have completely abated." Interim Award at 88. I agree. *See supra* at Section IV B(1). The Fund's position that the Arbitrator erred in concluding that a remand would be futile is premised on its contention that the Arbitrator misconstrued Section 4205(c). Defendant's Memorandum in Opposition at 39. As I previously discussed, I do not accept the Fund's contention. Rather, I agree with the Arbitrator that the case should not be remanded to the Fund and that the interim payments should be refunded; his holding is supported independently by his conclusion "regarding the proportional approach towards abatement." Supplemental Opinion at 20.

In affirming the Arbitrator's Interim Award, I do not pass upon his findings with respect to retroactivity. The Arbitrator found that a remand to the Fund to redraft the abatement provisions "which it would then apply retroactively to A & P would appear to violate the restriction in Section 4214(a) of the Act against retroactive application of changes in plan rules over the objections of non-consenting employers." Interim Award at 91. I note, however, that the Fund has not cited any decision permitting a plan to adopt an amendment after the fact which would create a retroactive withdrawal.

In the Supplemental Opinion, the Arbitrator found that, while the ultimate award was supported by his reasoning regarding the impropriety of retroactively applying a hypothetical redrafted 35% Amendment, his conclusions regarding retroactivity were not necessary to the result. He found:

> Technically, the [Interim Award] did not rule upon the issue of whether the Fund could retroactively apply a redrafted 35% Rule amendment retroactively to A & P. Any independent ruling on that issue ar-

guably would be premature. If a second 35% Rule amendment based assessment were to be issued by the Fund, then the questions related to the validity of such an assessment will have to be resolved in whatever proceeding has jurisdiction over challenges to that assessment.

Supplemental Opinion and Award at 17. I agree with the Arbitrator that the ultimate award is supported independently by his conclusions regarding proportionality and that a decision regarding retroactivity is not necessary to resolve this dispute.

The PBGC has not issued regulations concerning the equitable abatement provisions of 35% rules. Interim Award at 67. The Fund contends that any action it took relative to the adoption of its 35% Amendment is protected by Section 405(a) of MPPAA, which is not codified. *See e.g.,* Defendant's Memorandum in Opposition at 39–43. That Section provides:

> (a) Except as otherwise provided in the amendments made by this Act and in Subsection (b), if the way in which any such amendment will apply to a particular circumstance is to be set forth in the regulations, any reasonable actions during the period before such regulations take effect shall be treated as complying with such regulation for such period.

Section 405(a) of MPPAA.

A & P argues that Section 405 protects plans only against retroactive adoption of regulations by PBGC. The Fund cites no court or arbitration decision in which a court or arbitrator has relied on Section 405 to remand an invalid plan rule so that it can be amended by the plan. I am unpersuaded by the Fund's broad reading of Section 405(a). For these reasons and those above, I will affirm the Arbitrator's Interim Award.

### ORDER

AND NOW, this 10th day of January, 1992, upon consideration of plaintiff's and defendant's motions to vacate in part and to enforce in part the Interim Award and

Supplemental Opinion of Ira F. Jaffe, Esq., the Impartial Arbitrator; plaintiff's request for an immediate refund; the memoranda in support and in opposition thereto; and of the letter briefs of the parties dated October 16, 17 and 23, 1991, and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. Plaintiff's Motion to Remove the Action from Suspense Docket and to Enforce Arbitration Award is GRANTED;

2. Plaintiff's Supplemental Motion to Vacate Arbitration Award in Part is DENIED AS MOOT;

3. Defendant's Cross Motion to Vacate Arbitration Award and to Enforce the Award Against A & P is DENIED;

4. The Interim Award and Supplemental Award are AFFIRMED and shall be ENFORCED;

5. Plaintiff's request for a refund prior to judicial review is DENIED AS MOOT;

6. Judgment is ENTERED in favor of Plaintiff and AGAINST defendants in the amount of $9,647,132.67, plus appropriate interest.

APPENDIX A